UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
BEN J. ADDIEGO &                        )
KAREN ADDIEGO                           )
                                        )
        Plaintiffs,                     )
                                        )
            v.                          )        Civil Action No. 07-cv-12357-NMG
                                        )
KENNETH L. NORTON BUILDER, INC.         )
& KENNETH L. NORTON                     )
                                        )
        Defendants.                     )
_____)

## RECOMMENDED FINDINGS OF FACT AND RULINGS
## OF LAW ON DAMAGES AGAINST DEFAULTING DEFENDANTS

December 23, 2010

BOAL, M.J.

        This action arises out of a residential construction and remodeling project in Nantucket,

Massachusetts.  Plaintiffs Ben J. Addiego and Karen Addiego ("Plaintiffs" or the "Addiegos")

contracted with defendant Kenneth L. Norton Builder, Inc. ("Norton Inc.") to construct a garage

on their property and to perform certain renovations on their existing house.  The Addiegos

assert various claims against Norton Inc. and its sole owner Kenneth L. Norton ("Norton")

(Norton and Norton Inc. are collectively referred to as "Defendants").

        This matter is presently before the Court on the Plaintiffs' motion for default judgment

and assessment of damages (Docket No. 27).  This Court held an assessment of damages hearing

on November 22, 2010 (the "Hearing"), at which the Plaintiffs presented the expert testimony of

George G. Byl regarding the amount of their damages.  In addition, the Plaintiffs submitted

affidavits and documentary evidence.[1]  Based on the pleadings, the evidence, and submissions on

damages, this Court makes the following recommended findings of facts and rulings of law.  In

summary, this Court recommends that the District Judge enter default judgment against the

Defendants in the amount of $1,418,916.79.

<u>PROCEDURAL BACKGROUND</u>

The Addiegos commenced this action against Norton Inc. on December 20, 2007.

(Complaint, Docket No. 1).  The Complaint alleged deceit, breach of contract, fraudulent

inducement to contract, and *quantum meruit* claims against Norton Inc.  On April 28, 2008, the

Addiegos amended their complaint to add a claim of unfair and deceptive practices pursuant to

M.G.L. c. 93A.  (Amended Complaint, Docket No. 3).  Norton Inc., represented by counsel,

appeared in the case and filed an answer to the Amended Complaint.  Norton Inc. also filed a

breach of contract and *quantum meruit* counterclaim against the Addiegos in the amount of

$66,477.08.  (Answer to Amended Complaint, Docket No. 7).  The parties engaged in some

discovery.

On December 17, 2009, the Addiegos amended their complaint to add Norton,

individually, as a defendant in the case.  (Second Amended Complaint, Docket No. 18).  The

Addiegos alleged that Norton was individually liable to them because he personally participated

and directed the actions that caused injury.  The Addiegos also alleged that Norton was the "alter

---

[1] More specifically, the Plaintiffs submitted the following documents: (1) Memorandum
in Support of Motion for Default Judgment dated March 10, 2010 (Docket No. 28) with exhibits;
(2) Affidavit of Ben J. Addiego dated February 26, 2010 (Docket No. 28-1); (3) Affidavit of
Karen Addiego dated February 26, 2010 (Docket No. 28-2); (4) Plaintiffs' Supplemental
Memorandum Regarding Damages dated November 8, 2010 (Docket No. 30); (5) Affidavit of
Robert Hillman dated November 8, 2010 (Docket No. 31); and (6) Affidavit of Karen Addiego
dated November 8, 2010 (Docket No. 32).

ego" of Norton Inc. and, therefore, the Court should pierce the corporate veil in order to find liability against Norton individually. (Id. at ¶¶ 94-100).

On December 18, 2009, Norton Inc.'s counsel moved to withdraw as attorney for Norton Inc. (Docket No. 20). The Court granted the motion to withdraw on January 12, 2010. No successor counsel appeared for Norton Inc. Norton never entered an appearance in the case. Both Norton Inc. and Norton failed to answer the Second Amended Complaint. Accordingly, on January 28, 2010, the Clerk entered a default against both Defendants. (Docket Nos. 23-24). On March 10, 2010, the Addiegos filed their motion for default judgment and assessment of damages. (Docket No. 27). Pursuant to this Court's October 13, 2010 scheduling order, the Addiegos filed additional pleadings and affidavits supporting their damage claims on November 8, 2010. (Docket Nos. 30-32). On November 22, 2010, this Court held an assessment of damages hearing at which the Addiegos presented the testimony of their expert, George G. Byl.

## STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." The court may then enter a default judgment when the party entitled to a default judgment applies to the court. Fed. R. Civ. P. 55(b)(2).

A "default judgment on the well-pleaded allegations in [a] complaint establishe[s] only [the] defendant's liability." Eisler v. Stritzler, 535 F.2d 148, 153 (1st Cir. 1976). "Those allegations relating to the amount of damages, however, are not taken as true." Rodriguez v. Craig, No. 91-10665-RWZ, 1994 WL 561999, at * 2 (D. Mass. Sept. 29, 1994), and cases cited.

See also KPS Assocs., Inc. v. Designs by FMC, Inc., 318 F.3d 1, 19 (1st Cir. 2003); Century ML-Cable Corp. v. Carrillo Diaz, 39 F.Supp. 2d 121, 123 (D.P.R. 1999).  Therefore, the plaintiff has the burden of establishing the amount of damages it is entitled to recover.  See, e.g., Eisler v. Stritzler, 535 F.2d at 153-54; G.&C. Merriam Co. v. Webster Dictionary Co., Inc., 639 F.2d 29, 34 n. 7 (1st Cir. 1980).

An assessment of damages hearing is unnecessary if calculating the amount of damages "involves nothing more than arithmetic–the making of computations which may be figured from the record."  HMG Prop. Investors, Inc. v. Parque Indus. Rio Canas, Inc., 847 F.2d 908, 919 (1st Cir. 1988).  In all other cases, however,

> [t]he court may conduct hearings or make referrals–preserving any federal statutory right to a jury trial–when, to enter or effectuate a judgment, it needs to:
>
> (A) conduct an accounting;
> (B) determine the amount of damages;
> (C) establish the truth of any allegation by evidence; or
> (D) investigate any other matter.

Fed. R. Civ. P. 55(b)(2); accord Jones v. Winnepesaukee Realty, 990 F.2d 1, 3-5 (1st Cir. 1993) (conducting evidentiary hearing to determine damages); Rodriguez v. Craig, 1994 WL 561999, at * 1-2 (convening hearing to assess damages).

"Once the entry of default establishes the *fact* of damage, the trial judge, sitting without a jury in a Rule 55 proceeding, has considerable latitude in determining the *amount* of damages." Jones v. Winnepesaukee Realty, 990 F.2d at 4 (emphasis in original) (citations omitted). Nevertheless, even "[a]fter entry of default, a court may examine a plaintiff's complaint to determine whether it alleges a cause of action.  In making that determination it must assume that all well pleaded factual allegations are true."  Quirindongo Pacheco v. Rolon Morales, 953 F.2d

15, 16 (1st Cir. 1992) and cases cited; accord Rodriguez v. Craig, 1994 WL 561999, at * 2-3 (refusing to assess damages after default where complaint failed to state a claim).

Applying these standards to the instant case, the court makes the following proposed findings of fact and rulings of law.

FINDINGS OF FACT

The Contract Between The Addiegos And Norton Inc.

1.  Norton Inc. was a corporation engaged in the business of providing construction and renovation services to customers. Norton Inc.'s corporate existence has lapsed and it is no longer a corporation in good standing in the Commonwealth of Massachusetts. (Second Amended Complaint, ¶ 5).

2.  Norton is an individual and is a principal of Norton Inc. Norton owned all or substantially all of the stock of Norton Inc., directed the operations of Norton Inc., and conducted and directed all business operations of Norton Inc. (Second Amended Complaint, ¶ 3).

3.  Ben J. Addiego and Karen Addiego own a property located at 8 Midland Avenue, Nantucket, Massachusetts (the "Property"). (Second Amended Complaint, ¶ 1).

4.  In or around December 2003, the Addiegos contacted Norton to discuss potential work on the Property. From late December 2003 through 2004, the Addiegos and Norton conducted preliminary discussions regarding a construction project on the Property, including the repair of a portion of the existing house and the construction of a detached garage and studio (the "Project"). (Second Amended Complaint, ¶¶ 7-8).

5.  The Project was to include three phases: (i) the construction of a two-car garage with a

studio on the second floor ("Phase I work"); (ii) repairs of portions of the existing house

("Phase II work"); and (iii) replacement of a defective chimney in the existing house

("Phase III work"). (Second Amended Complaint, ¶ 9).

6. By December 2004, plans had been prepared for the Project. In late December 2004, the

Addiegos and Norton began a series of discussions concerning the terms under which

Norton Inc. would complete the Project. (Second Amended Complaint, ¶ 10).

7. In the course of their discussions, Norton made the following representations to the

Addiegos concerning the Phase I work: (a) that he would perform the work and that it

would be completed in a good and workmanlike manner comparable to the construction

which the Addiegos had witnessed in the neighborhood; (b) that construction would

involve simultaneous work on all three phases; (c) that the work would include the

construction of a garage and studio built according to certain plans drawn by Sandcastle

Construction and approved by the town of Nantucket; (d) that the reasonable estimated

cost of the construction of the garage and studio was $285,000; (e) that Norton estimated

that the Phase I work would be completed in seven months from January 10, 2005; (f)

that Norton would bill the Addiegos on a "cost-plus 15% basis," which included

subcontractor invoicing; (g) that the labor rate for carpenters would be $75/hour; (h) that

the labor rate for a carpentry foreman would be $60/hour; and (i) that the labor rate for

Norton would be $75/hour. (Second Amended Complaint, ¶ 11).

8. With respect to Phase II work, Norton made the following representations to the

Addiegos: (a) that the work on the main house would be completed in a good and

workmanlike manner; (b) that the existing garage would be converted into living space;

(c) that the reasonable estimated cost of Phase II work was $185,000; (d) that Norton estimated that the work would be completed in four months from January 10, 2005; and (e) that Norton would bill the Addiegos for the work on a cost-plus 15% basis with the same labor rates as Phase I work.  (Second Amended Complaint, ¶ 13).

9.  With respect to Phase III work, Norton made the following representations to the Addiegos: (a) that the estimated cost of the work would be $35,000; (b) that the estimated time required to complete the work was three months; and (c) that Norton would bill the Addiegos for the work on a cost-plus 15% basis with the same labor rates as Phase I and II Work.  (Second Amended Complaint, ¶ 15).

10.  On or about January 10, 2005, Norton presented a document titled Preliminary Contract Agreement to the Addiegos.  Norton represented that the purpose of the Preliminary Contract Agreement was "to gain additional information and knowledge as to any further areas of work and or problems arising from this scope of work outline and the accompanied payment plan schedule."  Norton further represented that "[o]nce this preliminary agreement is signed I will submit this document to my attorney who will draw up the AIA document, which is the standard form of agreement between owner and contractor."  Norton drafted the Preliminary Contract Agreement.  (Second Amended Complaint, ¶¶ 18-19).

11.  On or about January 12, 2005, Norton presented the Addiegos with a document entitled Contract Agreement.  The Contract Agreement was drafted by Norton.  Norton represented to the Addiegos that the Contract Agreement would be signed instead of the AIA document referenced in the Preliminary Contract Agreement.  (Second Amended

Complaint, ¶ 20).

12.     The signed Contract Agreement was structured as a "cost-plus" agreement.  A "cost plus"
        contract is a contract in which the contractor is paid his total costs plus a stated
        percentage profit.  In this case, the stated percentage profit was fifteen percent.  (Exhibit
        2 to 9/29/09 Byl Report; Testimony of George Byl at Hearing ("Byl Testimony")).

13.     The Addiegos entered into the Contract Agreement in reliance upon the foregoing
        representations by Norton.  (Second Amended Complaint, ¶ 21).

Regulatory Violations Of The Massachusetts Home
Improvement Contractor Act, M.G.L. c. 142A

14.     Norton was a licensed builder and had a home improvement license from the
        Commonwealth of Massachusetts.  Holding such licenses, Norton was subject to the
        Massachusetts Building Code.  (Second Amended Complaint, ¶ 30; 9/29/09 Byl Report at
        6 and Exhibits 6, 8; 10/25/09 Byl Report at 6).

15.     Norton did not provide the Addiegos with a complete agreement containing a detailed
        description of the work to be performed as required by the Massachusetts Building Code.
        (Second Amended Complaint, ¶ 31; 9/29/09 Byl Report at 6; 10/25/09 Byl Report at 6).

16.     Norton did not file a written building permit application for the work to be performed in
        connection with Phase II of the Project.  (Second Amended Complaint, ¶¶ 32-33; 9/29/09
        Byl Report at 6-7; 10/25/09 Byl Report at 6-7).

17.     Norton also misrepresented the scope of the Phase I work by omitting from the building
        permit application the construction of the kitchen or either of the two bathrooms in the
        garage/studio.  (Second Amended Complaint, ¶ 32; 9/29/10 Report at 7; 10/25/09 Report
        at 7).

<u>Defendants' Misrepresentations And Overbilling</u>

18.     The day following the execution of the Contract Agreement, Norton established a bank
        account to provide for the transfer of the funds for the work, entitled the
        "Norton/Addiego Construction Account."  The purpose of this account was to receive
        funds from the Addiegos to fund the work.  (Second Amended Complaint, ¶ 23).

19.     Norton represented to the Addiegos that the Norton/Addiego Construction Account
        would be a joint account and that the Addiegos would have access to the account.
        (Second Amended Complaint, ¶ 24).  Contrary to his representations, Norton did not set
        up the Norton/Addiego Construction Account as a joint account.  (Second Amended
        Complaint, ¶ 25).

20.     The parties' agreement also provided that Norton Inc. would segregate a one percent
        retainage in favor of the Addiegos.  Norton Inc. never segregated any funds as a
        retainage.  (Second Amended Complaint, ¶ 26).

21.     In the winter of 2005, the Addiegos resided in New Jersey.  By the summer of 2005, Ben
        Addiego was suffering from a variety of serious health issues that prevented him from
        traveling to Nantucket to observe the work on the Property.  (Second Amended
        Complaint, ¶ 28).

22.     During the course of the work, and in the absence of the Addiegos, Norton systematically
        misrepresented the progress of the work.  Through a series of mail and wire
        communications to the Addiegos, Norton misrepresented the state of the work and the
        projected completion date, while requesting additional funds.  The Addiegos, in reliance
        on Norton's representations, continued to fund the Project. (Second Amended Complaint,

¶¶ 29, 34-54).

23.     Norton also billed the Addiegos for labor that was not performed and materials that did not go to the Project. (Byl Testimony; 10/25/09 Byl Report at 10).

24.     Commencing on or around January 18, 2005 through October 2, 2006, the Addiegos transferred monies from their personal accounts to the Norton/Addiego Construction Account as payment for the Defendants' construction work.  By October 2, 2006, the Addiegos had transferred a total of $1,340,000 to the Norton/Addiego Account.  (Second Amended Complaint, ¶¶ 27, 34-35, 38, 42, 45, 47-48; 11/8/10 Affidavit of Karen Addiego ("Addiego Aff.") (Docket No. 32) at 2 and Exhibit A thereto).

25.     In August 2006, the Addiegos realized that the Project was more than 100 percent over budget and over a year past the time in which it was represented to them it would be completed.  The Addiegos came to Nantucket to meet with Norton.  After observing no work being done on the Property, on October 1, 2006, Ben Addiego spoke with Norton. He told Norton that Norton and Norton Inc. would have two weeks to complete the Project or his work would be terminated.  During the two weeks between October 1, 2006 and October 15, 2006, essentially no work was completed apart from minor carpentry work.  (Second Amended Complaint, ¶ 53).

26.      After October 15, 2006, the Addiegos did not permit Norton or persons associated with Norton Inc. to return to the Property.  (Second Amended Complaint, ¶ 54).

27.     After the Addiegos terminated Norton Inc., they engaged Rob Newman of Sandcastles Construction to oversee the completion of the work.  The Addiegos paid out in excess of $70,000 for completion of the Project after they terminated Norton Inc.  (Second

Amended Complaint, ¶ 56).

28. The Addiegos received and paid bills from subcontractors for work that Norton Inc. had billed and for which Norton had received payment from the Addiegos. (Second Amended Complaint, ¶ 57).

29. After Norton Inc. ceased work on the Project, the Addiegos learned that Norton had misrepresented the amounts charged for labor. By the terms of the contract, the amounts to be charged for labor were to be cost plus a 15 percent contractor's fee. However, Norton Inc. did not pay the carpenters the labor rate set forth in the contract. Instead, Norton Inc. paid carpenters substantially less than $60 per hour, and paid carpentry foremen less than $75 per hour. (Second Amended Complaint, ¶¶ 58-59).

Norton Was The Alter Ego Of Norton Inc.

30. Norton was the principal of Norton, Inc., its sole shareholder and president. Norton Inc.'s corporate existence lapsed. Norton had knowledge of the lapse and took no steps to revive the existence of the corporation. (Second Amended Complaint, ¶ 63).

31. In addition, Norton exercised pervasive control over the activities of Norton Inc. and intermingled assets with those of Norton Inc. (Second Amended Complaint, ¶ 96).

32. Norton failed to maintain corporate formalities. Norton was thinly capitalized, having little or no capital assets. Any corporate assets were siphoned away by Norton as the dominant shareholder. (Second Amended Complaint, ¶ 97-98).

The Addiegos' Damages

33. In order to calculate the damages suffered as a result of the Defendants' actions, the Addiegos retained the services of George G. Byl. Mr. Byl is a licensed professional

engineer with over forty years of experience in the construction industry.  He is also a licensed Massachusetts Home Improvement Contractor.  (Byl Testimony).

34.     Mr. Byl prepared two expert reports regarding the damages suffered by the Addiegos due to the Defendants' conduct dated September 29, 2009 and October 25, 2009.  The September 29, 2009 report was prepared after Mr. Byl inspected the Property on September 16, 2009 and reviewed the following documents: (1) Nantucket Building Department Documents for the residence at 8 Midland Avenue, Nantucket, MA; (2) the Contract Agreement; (3) Plans by Sandcastle Construction, Inc. dated 12/12/03, 10/13/04, 2/21/05 and 8/16/06; (4) Retaining Wall Plan by Mark McKenzie dated 5/16/05; (5) various correspondence between the Defendants and the Addiegos; (6) photographs of the Property; (7) various invoices produced by Norton, Inc.; (8) Defendant's Answers to Plaintiffs' Interrogatories; (9) the Complaint dated 12/20/07; (10) the Massachusetts Building Code, 780 CMR 6th Ed.; and (11) R.S. Means Residential Cost Data 2009.  (Byl Testimony; 9/29/09 Byl Report at 1).

35.     Byl concluded that the Defendants overbilled the Addiegos consistently, failed to inform them of actual progress and future costs, and failed to obtain building permits for major building changes.  Based on his estimates, Mr. Byl concluded that the Defendants overbilled the Addiegos in the amount of $628,728.40.  (Byl Testimony; 9/29/09 Byl Report at 12).

36.     After Mr. Byl rendered his September 29, 2009 Report, he spoke with the Addiegos and their counsel.  As a result of that conversation, Mr. Byl learned that certain work that he had attributed to Norton (*i.e.*, landscaping and fixtures) was in fact completed by a

different contractor. (Byl Testimony).

37. As a result of his conversation with the Addiegos and their counsel, on October 25, 2009, Mr. Byl produced a revised expert report. He again concluded that the Defendants overbilled the Addiegos consistently, failed to inform them of actual progress and future costs, and failed to obtain building permits for major building changes. Based on his estimates, Mr. Byl concluded that the Defendants overbilled the Addiegos in the amount of $658,282.84. (Byl Testimony; Byl 10/25/09 Report at 12).

38. In order to determine the amount of overbilling, Mr. Byl estimated the reasonable value of the construction work that was to be performed under the terms of the Contract Agreement (the "Contract Work"). In addition, Norton alleged that he performed work beyond the terms of the Contract Agreement after informing the Addiegos of the work required and receiving verbal permission (the "Additional Work").[2] Mr. Byl also estimated the reasonable value of the Additional Work. He then subtracted the total estimated reasonable value of both the Contract Work and the Additional Work from the total amount of money the Addiegos paid to Norton. (Byl Testimony).

39. Mr. Byl estimated the reasonable value of the Contract and Additional Work by using the RS Means Residential Cost Data, 2009 book. Mr. Byl testified that RS Means is a well-respected provider of construction cost guides. RS Means Cost Data books have been the gold standard for contractors and surety companies seeking to provide accurate construction estimates. RS Means cost data does not cover every possible construction

_____

[2] Norton never provided any estimates to the Addiegos regarding the cost of the Additional Work. (10/25/09 Byl Report at 4).

cost.  Where RS Means cost data was not available, Mr. Byl used his own estimates

based on his many years of experience in estimating construction costs.  (Byl Testimony).

40.     RS Means cost data is based on national averages.  Mr. Byl adjusted that data to reflect

Nantucket prices, which are higher than the national average.  (Byl Testimony; 10/25/09

Byl Report at 8).

41.     As Mr. Byl used the RS Means 2009 cost data, he reduced his estimates to reflect the

July 2005 construction values using the Engineering News Record Historical Cost

Indexes.  Norton bid the Project in December 2004.  However, work was done in 2005

and 2006, so Mr. Byl chose July 2005 as the most reasonable time reference for

construction costs.  (Byl Testimony; 10/25/09 Byl Report at 8).

42.     In Mr. Byl's opinion, his estimates are conservative. He testified that RS Means labor

costs tend to be higher than actual labor costs.  Also, the cost of materials used in Mr.

Byl's estimates is higher than the actual cost of materials at the time of the Project.  In

addition, he overestimated the cost of certain work.  Although, to be conservative, Mr.

Byl overestimated the cost of repairing the chimney, his estimate for that work was still

$10,000 lower than the price Norton quoted the Addiegos.  Mr. Byl believes that the

Defendants should have been able to perform the work at a lesser cost.  (Byl Testimony).

### Attorneys' Fees

43.     The Addiegos retained Robert Hillman and Deutsch Williams Brooks DeRensis &

Holland, P.C. as their counsel in this matter.  (Affidavit of Robert D. Hillman ("Hillman

Aff.") (Docket No. 31) at ¶ 1 and Exhibit A thereto).

44.     Mr. Hillman is an attorney admitted to practice in Massachusetts and to the bar of this

Court. He has been admitted to the Massachusetts Bar since 1988. He practices in the area of civil litigation, including the litigation of construction related disputes. (Hillman Aff., ¶ 2).

45. Mr. Hillman's current rate for his services is $350.00 per hour. Mr. Hillman billed his services in this matter at a discounted rate of $285.00 per hour. (Hillman Aff., ¶ 4).

46. Sandy A. Curko also performed legal services for the Addiegos in this matter. Ms. Curko is a litigator with approximately twelve years of experience. Her services were billed at $250 per hour. (Hearing; Exhibit A to Hillman Aff.).

47. Louis M. Ross, a land use specialist with twenty-two years of experience, also performed legal services for the Addiegos in this matter. Mr. Ross's services were billed at $250.00 per hour. (Hearing; Exhibit A to Hillman Aff.).

48. The total amount of attorneys' fees and expenses incurred by the Addiegos in this matter is $82,108.25. (Hillman Aff., ¶ 7).

<u>Expert's Fees</u>

49. The Addiegos paid Mr. Byl's company, Restructure Company, Inc., $20,242.86 for services performed by Mr. Byl in connection with this action. (Addiego Aff. at ¶ 5 and Exhibit B thereto).

50. Mr. Byl's services in this matter were billed at a rate of $225 per hour. (Exhibit B to Addiego Aff.).

51. An associate and an assistant at Restructure Company, Inc. also provided services in this matter at an hourly rate of $175 and $85, respectively. (Exhibit B to Addiego Aff.).

The Addiegos' Second Amended Complaint asserts six counts on which a default has been entered against the Defendants. Count I alleges deceit based on the series of misrepresentations that the Defendants made to the Addiegos prior to and during the completion of the Project. Count II alleges breach of contract based on the Defendants' failure to perform the work in a good and workmanlike manner, by exceeding all reasonable time and cost estimates, and by overbilling all or substantially all of the labor costs on the Project. Count III alleges that the Addiegos were fraudulently induced into entering into the Contract Agreement, based upon the Defendants' misrepresentations regarding the duration and the cost of the Project. Count IV is a *quantum meruit* claim in which the Addiegos claim that the Defendants are only entitled to the fair and reasonable value of the work they performed. Count V alleges unfair and deceptive practices under M.G.L. c. 93A. Finally, Count VI seeks to pierce Norton Inc.'s corporate veil based on Norton and Norton Inc.'s intermingling of assets, failure to maintain corporate formalities or produce tax returns.

The Addiegos stated that they are only seeking damages on their contract and Chapter 93A claims. (Hearing; Plaintiffs' Supplemental Memorandum Regarding Damages at 3-4). In so doing, the Addiegos argue that damages should be calculated based on a *quantum meruit* theory. In other words, the Defendants were only entitled to recover the fair and reasonable value of the work they performed. Because the Addiegos overpaid for the work performed by Defendants, they are now entitled to recover the difference. Although the Addiegos do not seek to recover damages on their deceit claim, they rely on the factual allegations regarding that claim to the extent those allegations are relevant to the Chapter 93A claim and the Addiegos' request

for treble damages thereunder.  (Id.).

For the foregoing reasons, the Court finds that the Addiegos are entitled to $658,282.84 in compensatory damages on their breach of contract and unfair and deceptive practices claims. In addition, the Court finds that the Defendants' actions were willful and knowing and makes an award of double, but not treble, damages under Chapter 93A.  The Court also finds that the Addiegos are entitled to reasonable attorneys' fees in the amount of $82,108.25 and expert fees in the amount of $20,242.86 under Chapter 93A.  Therefore, the Court recommends that the District Judge enter a total judgment against the Defendants in the amount of $1,418,916.79.

A.    Personal Liability of Kenneth Norton

The Addiegos allege that Norton is individually liable to them because he personally participated and directed the actions that injured them.  In addition, the Addiegos also allege that Norton was the "alter ego" of Norton Inc. and, therefore, the Court should pierce the corporate veil in order to find liability against Norton individually.  Because the Complaint alleges enough facts to establish both personal liability and to pierce the corporate veil, I find that the default establishes liability against Norton individually.  Specifically, the Addiegos allege that Norton exercised pervasive control of Norton Inc. and intermingled its personal funds with those of Norton Inc; that Norton failed to maintain corporate formalities; and that Norton was thinly capitalized.  (Second Amended Complaint at ¶¶ 94-99).  In addition, I find that the Plaintiffs' documentary submissions and the evidence adduced at the hearing show that Norton personally directed the actions that injured the Addiegos and therefore sufficiently establish liability against Norton individually on the Chapter 93A claim.  See Townsends, Inc. v. Beaupre, 47 Mass. App. Ct. 747, 751-52 (1999) (corporate officer is personally liable for a tort committed by the

corporation that employs him, if he personally participated in the tort by directing, controlling, approving or ratifying the act that injured the aggrieved party).

B.    Breach of Contract Damages

"To recover damages in a breach of contract claim, the plaintiff must prove the existence of a valid binding agreement, the defendant's breach thereof, and damages resulting from the breach." Mass Cash Register, Inc. v. Comtrex Sys. Corp. 901 F.Supp. 404, 415 (D. Mass. 1995) (citing Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995)).  Based on the Defendants' defaults, the only remaining issue is the amount of damages, if any, to which the Addiegos are entitled.

The law of damages seeks to protect the reasonable and foreseeable expectations of the party who suffered the breach.  See Int'l Totalizing Sys., Inc. v. PepsiCo, Inc., 29 Mass. App. Ct. 424, 430 (1990).  Typically, courts measure damages against the fundamental principle of compensation.  Ficara v. Belleau, 331 Mass. 80, 82 (1954).  Thus, the Addiegos are entitled to damages sufficient to put them in as good a position as if there had been no breach and the contract had been completed.  Concannon v. Galanti, 348 Mass. 71, 74 (1964).  However, the Addiegos should not be paid more than the full equivalent of their bargain.  Id. at 75.

Generally, when a contractor has breached a construction contract, Massachusetts law provides that the owner is entitled to recover either (1) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or (2) the difference between the value that the contracted for building would have had and the value of the performance that has been received by the plaintiff, if construction and completion in accordance with the contract would involve unreasonable economic waste.

See Louise Caroline Nursing Home, Inc. v. Dix Constr. Corp., 362 Mass. 306, 311 (1972);

Concannon, 348 Mass. at 74; Bachman v. Parkin, 19 Mass. App. Ct. 908, 909 (1984).

Here, the Defendants performed work both within and beyond the terms of the Contract

Agreement.  However, the Project was not finished.  In addition, the Court finds that the

Defendants overbilled for the work that was actually performed. Therefore, it becomes very

difficult to calculate the Addiegos' damages by reference to the formula set forth above.

The Addiegos' expert calculated their damages as the difference between the amount

paid by the Addiegos and the reasonable value of both the Contract Work and the Additional

Work.[3]  He calculated that amount to be $658,282.84.  Having heard the expert and his

methodology, I find that this amount fairly compensates the Addiegos for the damages they

suffered.  Accordingly, I find that the Addiegos are entitled to this amount.  See, e.g., Costa v.

Del La Femina, No. 20053536, 2006 WL 3201070 (Mass. Super. Oct. 17, 2006) (citing Lowrie

v. Castle, 225 Mass. 37, 51 (1916)) ("Once the plaintiff proves that she is entitled to damages,

she need not prove the amount of such damages with minute exactness.").

C.      Chapter 93A Damages

Mass. Gen. Laws Chapter 93A declares unlawful unfair methods of competition and

unfair and deceptive acts or practices in the conduct of any trade or commerce. M.G.L. c. 93A, §

2.  Chapter 93A liability exists if the defendant's conduct falls "within at least the penumbra of

some common-law, statutory, or other established concept of unfairness" or is "immoral,

---

[3] Although the Addiegos have alleged that the they paid in excess of $70,000 to complete the unfinished work and that they received and paid bills from tradesmen, which had been billed by and paid to Norton Inc. by the Addiegos, those amounts have not been included in Mr. Byl's calculation of damages.  (Byl Testimony).

unethical, oppressive or unscrupulous." Cambridge Plating Co., Inc. v. Napco, Inc., 85 F.3d 752, 769 (1st Cir. 1996) (internal quotations omitted).

In their Complaint, the Addiegos allege that during the course of the Project, and in the absence of the Addiegos, the Defendants systematically misrepresented the progress of the work and the projected completion date, while requesting additional funds. They also allege that the Defendants billed and were paid in excess of the stated Contract Agreement terms, misrepresented actual costs, and misrepresented the value of the work actually performed. Because the Addiegos have stated a viable Chapter 93A claim in their Second Amended Complaint, liability is established as to the Chapter 93A as well.

Further, the Addiegos allege that the Defendants violated the Massachusetts Home Improvement Contractor Act, M.G.L. c. 142A and 780 CMR (the "Act"). (Second Amended Complaint at ¶¶ 30-33). The Act requires a complete agreement and detailed description of the work. 780 CMR R6.5.1, 6.5.2. The Act prohibits use of "cost plus" contracts. 780 CMR 6.5.2.1(5). The Contract Agreement, however, was structured as "cost plus" agreement. At no time did the Defendants provide a clear description of the work. In addition, the Defendants failed to apply for building permits for some of the work to be performed and misrepresented the scope of the work in the applications for building permits that they did submit. Such violations of the Act are *per se* violations of Chapter 93A. See Reddish v. Bowen, 66 Mass. App. Ct. 621, 629 (2006) (holding that violations of M.G.L. c. 142A are *per se* violations of Chapter 93A). Accordingly, I find that the default coupled with the evidence at the Hearing establishes that the Defendants committed unfair and deceptive practices in violation of Chapter 93A.

Chapter 93A provides for the recovery of actual damages. M.G.L. c. 93A, § 9(3). As I

have found that the Addiegos' actual damages are $658,282.84, I find that this amount also compensates the Addiegos for the Defendants' unfair and deceptive practices. The Addiegos are not entitled to duplicative recovery under different claims.

1.      *Availability of Multiple Damages*

The Addiegos argue that they are entitled to recover double or treble damages under Chapter 93A. The Court finds that the Defendants' conduct was sufficiently egregious to warrant an award of double damages.

Chapter 93 A § 9(3) provides that if the court finds for the plaintiff, recovery will either be in the amount of actual damages or up to three but not less than two times the actual damages if the court finds that the defendant committed "a willful or knowing violation." Mass. Gen. Laws c. 93A § 9(3). Negligent unfairness or deception does not warrant the award of multiple damages; willful or knowing conduct requires a more purposeful level of culpability. Squeri v. McCarrick, 32 Mass. App. Ct. 203, 207 (1992); Wasserman v. Agnastopoulos, 22 Mass. App. Ct. 672, 681 (1986). A simple finding of intentional misrepresentation does not automatically trigger punitive damages. Arthur D. Little Int'l, Inc. v. Dooyang Corp., 979 F.Supp. 919, 926 (D. Mass. 1997) (Saris, J.) (citations omitted). "The law of Chapter 93A . . . has developed the sometimes elusive paradigm that a misrepresentation may be 'intentional' yet not 'willful or knowing.'" Id. at 926-27.

"Fortunately, this facially difficult distinction is made easier by asking, as has the Massachusetts Appeals Court, whether the party committing the intentional misrepresentation was 'genuinely hopeful of eventually fulfilling his contract or was deliberately deceptive and entirely disdainful of his commitments,' with only the latter having punitive damages levied

against him." Id. at 927 (internal quotations omitted).

A defendant's default does not automatically entitle a plaintiff to double or treble damages. In order to receive multiple damages by default, the complaint must have given the defendant fair notice of a multiple damage claim, either by an allegation that the Chapter 93A violation was willful or knowing or by seeking multiple damages. Marshall v. Stratus Pharm., Inc., 51 Mass. App. Ct. 667, 675-7 (2001); Multi Tech., Inc. v. Mitchell Mgmt. Sys., Inc., 25 Mass. App. Ct. 333, 336-7 (1988), superseded by statute on other grounds. The Addiegos sought punitive damages in their Chapter 93A claim. (Complaint ¶ 80). In addition, they put the Defendants on notice of their intention to seek multiple damages in their Chapter 93A demand letter. (March 19, 2008 Chapter 93A Demand Letter at 6-7). Accordingly, I find that Plaintiffs gave the Defendants fair notice of a multiple damage claim.

The plaintiff must also provide evidence of a knowing or willful violation of Chapter 93A at an evidentiary hearing. McGinty v. Beranger Volkswagen, Inc., 633 F.2d 226, 231 (1st Cir. 1980); Tropical Banana Co., Inc. v. Juan's Dominican Market, Inc., No. 05-342, 2006 WL 2927320, *2 (D.R.I. Sept. 18, 2006); Coady v. Stack, 1995 Mass. App. Div. 135, 137 (1995). Such evidence is required because the determination of whether a defendant's violation of Chapter 93A was intentional and knowing goes to the quantum of damages and is therefore not established by default. McGinty, 633 F.2d at 231; Marshall, 51 Mass. App. Ct. at 677.

This court finds that the Defendants knowingly and willfully violated Chapter 93A. The evidence presented by affidavits and at the Hearing shows that the Defendants' conduct was egregious. Norton took advantage of the Addiegos because they were absent, in poor health, and

unable to oversee the construction work.[4]  He consistently misrepresented to the Addiegos the actual state of the work.  Moreover, Mr. Byl's review of Norton's work and invoices reflect gross overbilling.  The Defendants applied mark ups to labor rates that were not disclosed to the Addiegos.  Norton quoted the Addiegos labor rates as actual costs when in reality those rates built an enormous margin of profit.  In addition, Mr. Byl discovered that the Defendants billed for labor that was not actually performed and for materials that were never delivered.  Under these circumstances, the Court finds that the Defendants' conduct was knowing and willful and, therefore, that the Addiegos are entitled to recover two times their actual damages.

2.    *Attorneys' Fees Under Chapter 93A*

Pursuant to Mass. Gen. Laws c. 93A § 9(4), a plaintiff will receive "reasonable attorneys' fees" if the court finds that the defendant committed an unfair trade practice in violation of Mass. Gen. Laws c. 93A §(2).  Because this court has found that the Defendants violated Chapter 93A, Plaintiffs are entitled to attorneys' fees.

State law governs the method of calculating attorneys' fees.  Blanchette v. Cataldo, 734 F.2d 869, 878 (1st Cir. 1984).  An award of fees after a substantive violation of Chapter 93A is mandatory, even if the plaintiff fails to provide any evidence to establish a reasonable value of the award.  Id.  Defendants are jointly and severally liable for all of the attorneys' fees incurred by Plaintiffs.  See, e.g., International Fidelity Co. v. Wilson, 387 Mass. 841 (1983); United Rug Auctioneers, Inc. v. Arlasen, 16 Mass. L. Rep. 607 (2003).  Because this Court has found that the Defendants violated Chapter 93A, the Plaintiffs are entitled to recover reasonable attorneys' fees.

---

[4] Norton was aware of Mr. Addiego's poor health.  For example, in a letter dated August 12, 2004, Norton tells Mr. Addiego that it was "unfortunate that your health has not been what you would like it to be."  (Exhibit 1 to Byl 9/29/09 Report).

Massachusetts uses the lodestar method of determining attorneys' fees, which is the multiplication of a fair market hourly rate for the attorneys' services by the amount of reasonably spent time. Castricone v. Mical, 74 Mass. App. Ct. 591, 603 n. 14 (2009).

To support a claim for attorneys' fees, an applicant should furnish the court, by testimony or documentation, with a verified itemization of the fees including: (1) a biographical qualification of counsel describing education, training, experience and professional activities and achievements in support of the proposed hourly billing rate; and (2) chronological time sheets specifying services, dates, and the amounts of time taken for those services. Id. The pertinent market rate is the average rate in the attorney's community for similar work done by attorneys with similar experience. Id.

The court can consider the nature of the case and issues presented, the time and labor required, the amount of damages involved, and the result obtained in determining the amount of reasonably spent time. Killeen v. Westban Hotel Venture, LP, 69 Mass. App. Ct. 784, 791 (2007).

Plaintiffs seek $82,108.25 in attorneys' fees. Plaintiffs submitted their counsel's affidavit regarding their attorneys' fees and copies of all of their bills. Attorney Robert Hillman had primary responsibility for this case. His standard rate is $350 per hour but he charged the Addiegos at a discounted rate of $285 per hour. Two other experienced attorneys performed services in this action at the rate of $250 per hour. I find that the hourly rates charged are reasonable for a case of this nature. After reviewing the attorneys' bills, I also find that the hours spent in this case by the Plaintiffs' counsel were reasonable. Accordingly, I find that the Plaintiffs are entitled to recover $82,108.25 in attorneys' fees.

### 3. *Expert's Fees Under Chapter 93A*

The Addiegos also seek to recover $20,242.86 in expert's fees. Reasonable expert witness fees are normally recoverable in a Chapter 93A case. Maillet v. ATF-Davidson Co., Inc., 407 Mass. 185, 194 (1990). The Plaintiffs submitted an affidavit regarding the fees they have paid to their expert and documentation showing payments to their expert. In addition, the Court heard the Plaintiffs' expert, his opinion and his qualifications. Based on the record before the Court, the Court finds that the expert fees sought by the Plaintiffs are reasonable and finds that they are entitled to recover $20,242.86 in expert fees.

## RECOMMENDATION

For the foregoing reasons, this Court recommends that the District Judge enter a default judgment against the Defendants as follows:

| | |
|---|---|
| Compensatory Damages (Doubled under Chapter 93A) | $1,316,565.68 |
| Attorneys' Fees | $82,108.25 |
| Expert Fees | $20,242.86 |
| Total | $1,418,916.79 |

## REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. The parties are further advised that the United States Court of Appeals for this

Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Phinney v. Wentworth Douglas Hospital, 199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983 F.2d 343 (1st Cir.1993).

/s/ Jennifer C. Boal
Jennifer C. Boal
United States Magistrate Judge
